# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Joseph Muehlbauer,                              Civ. No. 14-3253 (MJD/JJK)

      Plaintiff,

v.

Carolyn Colvin,                                 **REPORT AND**
Acting Commissioner of                          **RECOMENDATION**
Social Security,

      Defendant.

Carol Lewis, Esq., Carol Lewis Law, counsel for Plaintiff.

Pamela A. Marentette, Esq., Assistant United States Attorney, counsel for Defendant.

JEFFREY J. KEYES, United States Magistrate Judge

Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff Joseph Muehlbauer seeks review of the final decision of the Acting Commissioner of Social Security ("Commissioner"), who denied Plaintiff's application for disability insurance benefits. The parties have filed cross-motions for summary judgment. (Doc. Nos. 15, 17). This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and D. Minn. Loc. R. 72.1. For the reasons stated below, this Court recommends that Plaintiff's motion be **DENIED** and Defendant's motion be **GRANTED**.

1

## BACKGROUND

### I.    Procedural History

Plaintiff protectively filed an application for a period of disability and

disability insurance benefits on July 22, 2013, alleging a disability onset date of

June 14, 2011.  (Tr. 12, 158, 197).[1]  The Social Security Administration ("SSA")

denied Plaintiff's claims initially on October 11, 2013 (Tr. 12, 104), and upon

reconsideration on February 20, 2014.  (Tr. 12, 110).  Following a timely request

for a hearing before an Administrative Law Judge ("ALJ"), Plaintiff testified at an

administrative hearing on May 8, 2014.  (Tr. 12, 35–53).  An impartial Medical

Expert ("ME") and an impartial Vocational Expert ("VE") also testified at the

administrative hearing.  (Tr. 12, 53–67).  On June 13, 2014, the ALJ issued an

unfavorable decision on Plaintiff's claims.  (Tr. 12–27).  Plaintiff timely filed a

request for review (Tr. 7), which was denied by the SSA Appeals Council on

August 14, 2014.  (Tr. 1–3). In denying Plaintiff's request for review, the Appeals

Council made the ALJ's decision the final decision of the Commissioner.  *See* 20

C.F.R. § 404.981.  On August 25, 2014, Plaintiff filed the present action, seeking

judicial review by this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

(Doc. No. 1).  Both parties have since timely filed cross-motions for summary

judgment, pursuant to D. Minn. Loc. R. 7.2(c).  (Doc. Nos. 15, 17).

---

[1] Throughout this Report and Recommendation, the abbreviation "Tr." is used to reference the Administrative Record (Doc. No. 13).

## II.    Factual Background

Plaintiff, born January 4, 1968, was 43 years old on June 14, 2011, his alleged disability onset date.  (Tr. 25).  He has graduated from high school and obtained a Bachelor's of Fine Arts degree.  (Tr. 25, 41).  Plaintiff has past relevant work experience as a bill collector, designer, and assistant manager.  (Tr. 25).  Plaintiff alleges that he became unable to work as of June 14, 2011, when he left his employment as a designer, which he had maintained since 2000.  (Tr. 43, 176–79).  In his disability report, Plaintiff provided a June 7, 2013 final work date (Tr. 197), although the ALJ determined that Plaintiff did not engage in substantial gainful activity since the alleged onset date.  (Tr. 14).  Plaintiff alleges disability due to a combination of cardiovascular and pulmonary impairments, potentially resulting from, or compounded by, his history of, and treatment for, Hodgkin's lymphoma, in addition to post-traumatic stress disorder ("PTSD"), degenerative joint disease ("DJD"), and degenerative disc disease ("DDD") of the spine, with back and neck pain.  (Tr. 14, 20, 109).

### A.    Medical History Prior to Alleged Disability Onset Date

Plaintiff was diagnosed with Hodgkin's disease at age nineteen and treated with sixty-six doses of radiation therapy.  (Tr. 119, 270, 333).  Regarding this history and treatment, an examining pulmonologist, Dr. David Risher, noted in 2013 that "[g]iven his extensive radiation exposure, [Plaintiff] is at high risk of cardiomyopathy in addition to the coronary artery disease ["CAD"] he is already suffering from."  (Tr. 335).

3

In 1987, Plaintiff received a splenectomy.[2]  (Tr. 406).  In 2005, Plaintiff underwent back surgery (lumbar fusion - L5-S1) and in 2010, he received neck surgery (cervical hemilaminectomy - left C6-C7). [3]  *Id.*

Plaintiff had his first myocardial infarction ("MI") in 2007.  (Tr. 293).  At that time, the MI was mostly right sided and Plaintiff was stented.  *Id.*  Despite noncompliance with his medications in 2007 (Tr. 285), Plaintiff "[did] quite well until about 2010" when he experienced and was admitted for angina.  (Tr. 293). During the 2010 episode, he was administered a stress test, which was unremarkable.  *Id.*  Plaintiff later reported that after the 2010 episode "he [did] not really ha[ve] any trouble" with his heart until July 2013.  *Id.*

In addition to CAD and Hodgkin's disease and radiation treatment, Plaintiff's 2013 medical reports list a past history of hypothyroidism, DJD, chronic back and neck pain.  (Tr. 280, 293–94). Prior to the June 14, 2011 onset date, Plaintiff experienced lower back pain radiating into the left leg and foot.  (Tr. 433).

---

[2] The U.S. National Library of Medicine's MedlinePlus defines a splenectomy as a surgical excision of the spleen.  *Splenectomy*, http://www.merriam-webster.com/medlineplus/splenectomy (last visited August 28, 2015).

[3] A cervical hemilaminectomy is the surgical removal of the posterior arch of a vertebra on only one side of the neck.  *Hemilaminectomy*, http://www.merriam-webster.com/medlineplus/hemilaminectomy (last visited August 28, 2015). *See also Laminectomy*, http://www.merriam-webster.com/medlineplus/laminectomy (last visited August 28, 2015).

An MRI on June 6, 2011 showed osteophytes at L5-S1 with mild nerve impingement at L5 and mild facet joint arthrosis bilaterally. [4]  *Id.*

### B.   Medical History After the Alleged Disability Onset Date

On June 29, 2012, Plaintiff complained of low back pain, wheezing, right-sided chest pressure, and tingling in his groin.  (Tr. 471).  Medical examination findings for this visit were unremarkable.  *Id.*  Plaintiff was encouraged to cease smoking to assist in mitigation of his potential chronic obstructive pulmonary disease ("COPD").  *Id.*

At a July 16, 2012 follow-up appointment, Plaintiff reported that his low back pain and breathing difficulty had continued.  (Tr. 472).  His nurse practitioner, Jill Stang, N.P., ("Ms. Stang") recommended cardiac stress testing, which Plaintiff was "not interested in," and noted that Plaintiff "continue[d] to smoke and ha[d] absolutely no interest in cessation."  *Id.*  Plaintiff scheduled a pulmonary function test for July 20, 2012, at the recommendation of Ms. Stang, which he did not attend.  (Tr. 474). On August 24, 2012, Plaintiff's wife called to report "a lot of back pain" and requested a prescription for Vicodin.  *Id.*  Ms. Stang required that Plaintiff be seen to receive pain medication.  *Id.*

On July 8, 2013, Plaintiff presented to the Emergency Room of the Saint Cloud Hospital for chest pain.  (Tr. 285).  He complained of a six-day period of chest pain, radiating into his shoulder, back, and jaw; lightheadedness; a

---

[4] An osteophyte is a pathological bony outgrowth. *Osteophyte*, http://www.merriam-webster.com/medlineplus/osteophyte (last visited August 28, 2015).

5

pounding heart; shortening of breath; and diaphoresis.[5]  (Tr. 288).  In response to his class IV angina, Plaintiff underwent a cardiac catheterization on July 9, 2013. (Tr. 296). On July 19, 2013, Plaintiff saw Ms. Stang, reporting that "all symptoms [had] resolved other than his chest pain."  (Tr. 476).

On July 23, 2013, Ms. Stang advised Plaintiff to see a cardiologist.  (Tr. 477).  The following day, Plaintiff attended a consultation, during which he complained of extreme fatigue, resulting in two or three naps per day; jaw and tooth pain during exertion; and shortness of breath.  (Tr. 280).  Plaintiff received another cardiac catheterization on July 26, 2013, having complained of "recurrent chest discomfort, both exertional and nonexertional, which has been progressive."  (Tr. 300, 478).  The procedure included a "[s]uccessful percutaneous coronary intervention to the mid left anterior descending artery with placement of drug-eluting stent."  (Tr. 307).

Following this second 2013 stenting, on July 30, 2013, Plaintiff complained of continued symptoms, with "heaviness in his chest with deep breath and with talking."  (Tr. 279).  Objective examination revealed no abnormalities and no further cardiac tests were recommended, as Plaintiff's symptoms "seem[ed] non cardiac."  *Id.*

---

[5] Diaphoresis is profuse perspiration artificially induced. *Diaphoresis*, http://www.merriam-webster.com/medlineplus/diaphoresis (last visited August 28, 2015).

Plaintiff has a history of dyspnea accompanying his chest pain.[6]  On August 2, 2013, he visited Ms. Stang, reporting no change in his symptoms following his most recent procedure.  (Tr. 478).  Ms. Stang's objective assessments during that visit were unremarkable, and noted that Plaintiff was seated comfortably and that there was no reproducible chest pain.  (Tr. 479).  Ms. Stang again noted that Plaintiff continued to smoke, and explained the importance of cessation.  *Id.*

A CT scan, performed August 5, 2013, revealed "[s]carring in both lungs predominantly in the left apex and left lung base.  There are scattered nodules in the lungs which measure 4 mm or less as well as some scattered ground-glass opacities."  (Tr. 311).  Following his abnormal CT scan, Plaintiff received a pulmonary consultation on August 29, 2013, which concluded that Plaintiff's "abnormal area in the left lung base suggests a static congenital or acquired abnormality . . . while [this abnormal area] may contribute to some mild abnormalities of lung function, [it] is probably not the largest cause for Mr. Muehlbauer's dyspnea . . . [Plaintiff] may need a cardiopulmonary exercise test as [the consulting physician did] not discover any overt cause of the severe symptoms [Plaintiff] is experiencing."  (Tr. 334–45).  Additionally, spirometry testing conducted during the consultation revealed no evidence of airflow obstruction and no other remarkable indicators.  (Tr. 333–34).  Following the

---

[6] Dyspnea is difficult or labored respiration. *Dyspnea*, http://www.merriam-webster.com/medlineplus/dyspnea (last visited August 28, 2015).

consulting physician's recommendation, Plaintiff obtained an echocardiogram on September 4, 2013, which showed normal left ventricular size with preserved systolic function; stage 1 (mild) diastolic dysfunction; mild tricuspid regurgitation; and normal right-sided cardiac pressures.  (Tr. 335–36).

On September 11, 2013, Plaintiff returned to his cardiologist for a follow-up.  (Tr. 348).  He was "quite frustrated with his problems" and complained that he did not feel better following the most recent stenting in July 2013.  *Id.*  All of Plaintiff's cardiac data was normal and "there [wa]s nothing to suggest pulmonary hypertension by his echocardiogram.  His arteries are as open as we can get them, and the total occlusion has collateralized.  There is no role for bypass surgery in my opinion.  [Plaintiff] does not feel particularly better . . . [but] from a cardiac viewpoint, I think he is doing as well as can be expected.  I do not think he is having active cardiac symptoms." (Tr. 349)

Plaintiff was seen at the Mayo Clinic on September 27, 2013, seeking physical therapy recommendations and complaining of chest wall pain and pain while lying down.  (Tr. 363).  During this visit, Plaintiff rose from chairs independently; independently climbed on and off of the examination table, and did not exhibit gait antaglia, i.e., a gait that develops as a way to avoid pain.  (Tr. 362–64).  He also exhibited normal neck and head alignment, guarded neck range of motion that improved with encouragement, mild limitation of shoulder range of motion, tender and very tight upper extremity muscles with some limited active, but not passive, range of motion, and reported that these physical tests

8

were not particularly painful. *Id.* The treating therapist recommended physical therapy, provided Plaintiff with a written home exercise program, which Plaintiff was able to demonstrate in full. *Id.* Plaintiff also was encouraged to stay active with a walking program five days a week. *Id.* Plaintiff stated to his therapist that he was functioning relatively well at the time of his visit, despite chronic pain and interrupted sleep. *Id.* The treating therapist was "unsure if [the Plaintiff's symptoms are] related to his musculoskeletal complaints, past neck and back surgeries or his cardiopulmonary issues." *Id.*

Plaintiff returned for treatment and testing at the Mayo Clinic on October 8, 2013. (Tr. 379). The results of a pulmonary function test showed a moderate obstructive pattern without an acute bronchodilator response, essentially preserved diffusing capacity, and normal oximetry. *Id.* A chest CT scan showed emphysematous changes, changes related to radiation fibrosis, and some focal cystic bronchiectasis. *Id.* Various nodules were found in the left upper lobe and right upper lobe, all of which were unchanged since 2007 and thus likely benign. *Id.* The physician reported that the dyspnea was most likely related to Plaintiff's COPD and deconditioning and therefore not cardiac related. *Id.* The physician also spoke with Plaintiff extensively about the importance of smoking cessation, as the physician recognized that Plaintiff had many medical challenges, but that many of them were modifiable. *Id.*

On October 12, 2013, Plaintiff, complaining of back and neck pain, received an MRI. (Tr. 442, 483). The MRI showed "degenerative levocurvature

with reversal of lordosis [and m]ultiple bulges and endplate osteophyte formation . . . most prominent at C5-C6 and C6-C7 with an element of impingement." (Tr. 443). Plaintiff's neurologist, Thomas Falloon, M.D., ("Dr. Falloon"), later reviewed this MRI and found postoperative changes of a left C6-C7 posterior cervical microdiscectomy and residual disc osteophyte complex at C6-C7, which had resulted in severe narrowing and other changes at C3-C4 and C4-C5. (Tr. 408).

On October 28, 2013, Plaintiff was scheduled for a thyroid biopsy. (Tr. 458, 487). Plaintiff had been advised to check with his cardiologist whether he could safely stop taking his cardiac medication in preparation for the procedure, but had forgotten to ask. (Tr. 487). Plaintiff stopped taking his cardiac medication in the days leading up to his schedule procedure and developed acute chest pain hours before his scheduled biopsy. (Tr. 458, 487). He was admitted to the Emergency Room and underwent emergent coronary angiography, which revealed luminal irregularities in the left anterior descending artery, likely resulting from the discontinuation of cardiac medication. (Tr. 458–60). Plaintiff received another stent and resumed his cardiac medication. (Tr. 459, 487). During a November 5, 2013 visit with Ms. Stang, Plaintiff reported no chest pain and no shortness of breath, but continued to complain of back and neck pain. (Tr. 487–88).

Plaintiff returned for clinic treatment on November 19, 2013, complaining of weakness in his left arm and numbness and tingling radiating down his arm to the fingers. (Tr. 406). Plaintiff also reported headaches, discomfort on the left

10

side of his face, urinary stress incontinence dating to his 2005 back surgery, and

some numbness and tingling into his anterior shins. *Id.* Objective examination

showed normal strength in Plaintiff's extremities with symmetric tendon reflexes.

(Tr. 408) Thomas Falloon, M.D., ("Dr. Falloon") explained to Plaintiff that his

symptoms and the October MRI suggested left upper extremity radiculopathy and

that there were surgical or more conservative approaches, including lifestyle

restrictions and medications. *Id.* Surgery was not recommended at that time, as

Plaintiff would be required to stop taking his cardiac medication for a week prior

to surgery, which had not been cleared by a cardiologist. (Tr. 408–09). On

November 21, 2013, cardiologist Richard Alpin, M.D., ("Dr. Alpin") confirmed that

Plaintiff could not stop his cardiac medication under any circumstances and must

remain on the medication for at least a year following his most recent

catheterization. (Tr. 409).

Plaintiff reported irregular heartbeats on November 15, 2013, and Dr. Alpin

recommended the use of a Holter monitor. (Tr. 437). The Holter readings were

very benign, with a fast heart rate attributed to smoking and chronic neck pain.

(Tr. 435). Dr. Alpin recommended a change to cardiac medication on December

2, 2013. (Tr. 436). Following the medication adjustment, Plaintiff reported a

strong heart beat at normal rates and that he felt better. *Id.*

On January 21, 2014, Plaintiff's wife contacted the clinic, reporting that

Plaintiff's pain medication was not working. (Tr. 463). Ms. Stang adjusted the

pain prescriptions, recommending use of a Fentanyl patch, a strong narcotic, with

Vicodin in between.  *Id.*  On February 7, 2014, following discussion with Plaintiff's wife that Plaintiff was experiencing extreme fatigue from his current prescriptions, Ms. Stang decreased Fenantyl dosage by half.  (Tr. 464).

Plaintiff visited Ms. Stang on February 25, 2014, complaining of a left eye corneal abrasion that has not been healing and left lower tooth pain, in addition to chronic pain and difficulty sleeping, which, combined, made him anxious and depressed.  (Tr. 464).  He reported significant neck pain with radiation down his left arm and limited mobility of that arm.  (Tr. 465).  Ms. Stang noted a tendency of the Plaintiff to undertreat his pain with prescribed medications, as the higher doses made him fatigued, and the lower doses did not treat his pain as well.  *Id.* Objective examination showed that Plaintiff sat "somewhat guarded . . . [wa]s hesitant to move his neck and does tend to brace his left arm due to pain," no adenopathy in the neck, clear lung sound throughout, and a regular heart rate and rhythm.  *Id.*  Ms. Stang further adjusted Plaintiff's prescriptions for pain, anxiety, and depression, adding Cymbalta to the lower-dose Fenantyl and recommending Vicodin every six hours with consistency.  *Id.*  Ms. Stang also noted during this visit that she would dictate a letter, requested by Plaintiff, detailing all of his health conditions for his disability application.  *Id.*

Dr. Alpin noted, on March 6, 2014, that Plaintiff complained of severe palpitations every few days and profound and worsening fatigue.  (Tr. 434).   The cardiologist recommended adjustment of medication and potential sleep studies. (Tr. 435).

On April 25, 2014, Plaintiff reported shin and leg pain when lying down and groin area numbness and tingling when sitting on hard surfaces. (Tr. 467). When asked if he was experiencing any chest pain, nausea, or dizziness, Plaintiff stated that he was, attributing it to COPD. *Id.* Plaintiff visited Ms. Stang on April 28, 2014, complaining of the symptoms provided during his April 25, 2014 report, as well as continued back pain. (Tr. 468). Ms. Stang's assessment was for low back pain with bilateral radiculopathy and she suggested a lumbar MRI. *Id.*

### B.   Testimony at Administrative Hearing

A hearing before the ALJ took place on May 8, 2014, at which Plaintiff, a VE, and an ME testified. (Tr. 35–67). At the time of the hearing, Plaintiff was six feet tall and approximately 223 pounds. (Tr. 38). He testified that he was receiving short-term, and then long-term, disability from his most recent employer, with whom he had worked until July 7, 2013. (Tr. 39–40). Plaintiff testified that he was no longer able to drive a vehicle because he cannot look behind or to the side. (Tr. 41). He also testified that he has a Bachelor of Fine Arts degree and knows how to use a computer. *Id.* When asked if he smoked, Plaintiff answered that he did not, as he had quit on May 1, 2014. (Tr. 41–42). He also testified that he had smoked approximately a quarter-pack per day for a total of approximately ten years. (Tr. 42).

Plaintiff described difficulty walking due to a bulging muscle in his back and a pinched nerve. (Tr. 42–43). He further testified that these issues were why he stopped working at Home Depot at the time of his alleged disability onset date.

13

(Tr. 43).  He testified that he had used a cane in the past, but his neck issues made it so that he could no longer hold the cane; he then switched to a cart to support himself when walking.  *Id.*  Plaintiff testified that he performed most basic tasks, including dressing, bathing, and feeding himself, but that his wife performs most of the other home activities.  (Tr. 44).

The ALJ reviewed Plaintiff's medical record through questioning.  Plaintiff added that his most recent lumbar MRI revealed a disc abutting his spinal cord, for which Ms. Stang recommended physical therapy.  (Tr. 49).  Plaintiff also testified to ongoing chest pain experienced every night and "maybe three or four [other] times a week," with the severity of pain at times impacting his vision.  (Tr. 50).  In response to his attorney's questions, Plaintiff testified that he typically woke at 3:00 A.M., unable to sleep, and tried to sleep sitting on the couch, a routine that had lasted the past two years.  (Tr. 51–52).  He also testified to routine naps at 10:00 AM and 4:00 PM, due to his exhaustion; and that he spends much of his time at home trying to position himself in a manner that alleviates his pain.  (Tr. 52).

The ME then testified to the impairments noted in the medical record, including remote history of Hodgkin's disease under listing 13.05(b), CAD under listing 4.04, COPD under listing 3.02, back pain secondary to DDD with a history of fusion under listing 1.04, and DDD of the neck with questionable impingement under listing 1.04.  (Tr. 54–55).  The ME then testified that Plaintiff's impairments do not meet Social Security's medical listings.  (Tr. 55).  The ME also testified to

14

limitations he would impose on Plaintiff in a work setting, including lifting limits; opportunity to change positions at an otherwise sedentary position; no climbing or unprotected heights; limited stooping, crawling, crouching, or overhead reaching bilaterally; and no exposure to extreme toxins or temperatures.  (Tr. 55–56).  When questioned by Plaintiff's attorney why the impairments on the record do not combine to meet one of the listings, the ME responded that he testified to the objective, not the subjective findings on the record and that the objective findings showed coronary artery intervention with subsequent good circulation, good bilateral strength in the upper extremities, and only potential impingement in the neck and back.  (Tr. 59).

The VE then responded to two hypothetical questions posed by the ALJ.  (Tr. 64–66).  First, the VE testified that an individual with the same age, skills, recorded impairments, and limitations as the Plaintiff would not be able to perform Plaintiff's past relevant work.  (Tr. 64).  Responding to the ALJ's first hypothetical, the VE testified that one[7] unskilled position listed in the Dictionary of

---

[7] Responding to the first hypothetical, the VE also testified that a second position, "inspector," was available to Plaintiff.  *See* Tr. 65.  The VE incorrectly cited DOT 685.687-014, which is actually the entry for the cuff folder position.  *See id.* 'Cloth inspector' is DOT 685.687-010 and has a substantively higher specific vocational preparation level (4) than the skill of the cuff folder position (2).  This error raises the specter that the VE improperly analyzed Plaintiff's suitability for this position.  As a result, the VE testimony relating to this position is omitted from the Court's analysis.  This inconsistency likely has no material effect, however, since the telephone quotation clerk and bench hand positions alternatively exist in sufficient numbers in the national economy.  *See* notes 8–9 *infra.*

Occupational Titles ("DOT")—telephone quotation clerk[8]—was possible given

Plaintiff's impairments and RFC.  (Tr. 65).  An estimated 2,000 jobs of this type

exist in Minnesota.  *Id.*

In the second hypothetical, the ALJ restricted the hypothetical further, to

"no more than routine, repetitive, three- to four-step tasks, no more than brief

superficial contacts with others in a work setting, no more than routine stressors

of this kind of routine repetitive job."  *Id.*  The VE responded that the telephone

quotation clerk position would no longer be possible, but that the position of

bench hand[9], with 2,550 such jobs in Minnesota, would be a suitable option.  *Id.*

The ALJ then asked the VE whether there were any jobs that a person

could hold with the limitations listed in Plaintiff's functional capacity evaluation

("FCE"), dated December 3, 2013.  (Tr. 66).  The VE responded that there were

not.  *Id.*

## C.    The ALJ's Findings and Unfavorable Decision

The ALJ issued the decision on June 13, 2014.  (Tr. 12–27).  The ALJ

followed the five-step sequential process established by the SSA for determining

whether an individual is disabled.  *See* 20 C.F.R. § 404.1520.  At the first step

the ALJ found that Plaintiff had not been engaged in substantial gainful activity

---

[8] A telephone quotation clerk "answers telephone calls from customers requesting current stock quotations and provides information posted on [an] electronic quote board." *Telephone Quotation Clerk*, DICTIONARY OF OCCUPATIONAL TITLES 237.367-046.

[9] A bench hand "positions screws in rims of balance wheels and secures screws in place, using [a] screwdriver." *Bench Hand*, DICTIONARY OF OCCUPATIONAL TITLES 715.684-026.

since his amended alleged onset date.  (Tr. 14).  At step two, the ALJ found that

Plaintiff was severely impaired by remote history of Hodgkin's disease; CAD

status post percutaneous coronary intervention to mid-circumflex coronary artery

in July 2013; COPD; DJD; and DDD of the cervical and lumbar spine with back

and neck pain and history of lumbar fusion.  *Id.*  At step three, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the severity of one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1.  (Tr. 18).  Next, the ALJ found that Plaintiff retained

the capacity to

> [P]erform sedentary work as defined in 20 CFR 404.1567(a) except: he
> would not be able to do any work without having a sit/stand option at least
> every 30 minutes where he could changes [sic] position for a brief period;
> he would not be able to use ropes, ladders or scaffolds; could not more
> than occasionally do stooping, crawling, crouching or overhead tasks;
> would be precluded from high extremes of air pollutants or temperature
> extremes.

(Tr. 19).  At step four, the ALJ found that Plaintiff was unable to perform any of

his past relevant work.  (Tr. 25).  At the fifth step, the ALJ found that Plaintiff

retained the capacity to perform other sedentary jobs that exist in significant

numbers in the national and regional economy.  (Tr. 25–26).

## DISCUSSION

Plaintiff contends on appeal that the ALJ committed reversible error in the

following respects: (1) the ALJ erred in finding that Plaintiff did not have an

impairment or combination of impairments that satisfied listings 1.04A and 4.04B

and contends that the ALJ failed in his duty to fully and fairly develop the record;

17

(2) the ALJ erred by not giving proper weight to an FCE conducted by Rose Marie Bankers ("Ms. Bankers"); and (3) the ALJ erred in improperly relying on the VE's testimony. *See* Pl. Memo. in Support of Motion for Summary Judgment (hereinafter Pl. Memo.).

## I.   Standard of Review

Title II of the Social Security Act ("the Act") authorizes this Court to review the Commissioner's final decision.  42 U.S.C. § 405(g).  It specifies that the findings of the Commissioner "as to any fact, if supported by substantial evidence, shall be conclusive." *Id.*  This Court's review is constrained to a determination of whether substantial evidence in the record as a whole supports the ALJ's decision. *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005).  "Substantial evidence is less than a preponderance, but enough evidence that a reasonable mind might accept it as adequate to support a decision." *Kirby v. Astrue*, 500 F.3d 953 705, 707 (8th Cir. 2007) (citing *Simmons v. Massanari*, 264 F.3d 751, 755 (8th Cir. 2001)).  If substantial evidence supports the ALJ's decision, this Court must affirm it, even if substantial evidence also supports a different conclusion. *Tellez*, 403 F.3d at 956.  This Court must therefore "defer heavily to the findings and conclusions of the [SSA]." *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010) (citing *Howard v. Massanari*, 255 F.3d 577, 581 (8th Cir. 2001)).

II.     **Analysis of the ALJ's Decision**

A.     **Plaintiff Failed to Meet the Burden of Proof That He Satisfied An Appendix 1 Listing**

Plaintiff first contends that the ALJ erred at the third step in the disability determination process, finding that Plaintiff's impairments did not meet listings 1.04A and 4.04B.  *See* Pl Memo. at 11.  Additionally, Plaintiff contends that the ALJ failed in his duty to fully and fairly develop the record with respect to the third step of the evaluation.  *Id.*  At this third step, Plaintiff bears the burden of proof of disability.  *See Bowen v. Yuckert*, 482 U.S. 137, 141 (1987).

Listing 1.04A requires that DDD must result in compromise of a nerve root and evidence of nerve root compression characterized by limitation of motion of the spine, neuro-anatomic pain distribution, or motor function loss accompanied by sensory or reflex loss.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 1.04A. Before the ALJ, the ME testified that objective evidence, specifically MRIs of the neck and back, did not show nerve root impingement. (Tr. 59).  It is well established that, after review of the record as a whole, the ALJ may rely on ME opinion.  *Richardson v. Perales*, 402 U.S. 389, 408 (1971); *Casey v. Astrue*, 503 F.3d 687, 694 (8th Cir. 2007); *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001); *Rehder v. Apfel*, 205 F.3d 1056, 1060 (8th Cir. 2000).  Since substantial evidence supports the ALJ's determination that Plaintiff did not prove that his DDD satisfied listing 1.04A, this Court finds no reversible error on this issue.

Listing 4.04B requires ischemic heart disease with symptoms due to myocardial ischemia while on a prescribed treatment regimen with three separate ischemic episodes, each requiring revascularization or not amenable to revascularization within a consecutive 12 month period.  *See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Listing 4.04B. Plaintiff maintains that three revascularizations occurred, on July 9, July 25, and October 24, 2013.  *See* Pl. Memo. at 11.  The ME, reviewing the entire record, determined two revascularizations occurred, since the treatment on October 24, 2013 did not include a revascularization.  (Tr. 60).  Plaintiff has not presented argument that these three instances, or some other cardiac event, satisfy all of the requirements of listing 4.04B.  *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (stating claimant must demonstrate that the impairment meets all of the specified medical criteria).  Even assuming *arguendo* that the October 24, 2013 episode had included a revascularization or was not amenable to revascularization as defined under 20 C.F.R. Part 404, Subpart P, Appendix 1 § 4.00E9f, Plaintiff was not on his prescribed treatment regimen when he experienced symptoms leading to his treatment.  (Tr. 445).  As substantial evidence supports the ALJ's determination that Plaintiff did not meet his burden of proof with regard to listing 4.04B, this Court finds no reversible error on this issue.

Plaintiff also argues that the ALJ failed in his duty to fully and fairly develop the record, but offers no argument in support of the contention of error.  *See* Pl. Memo. at 11.  Issues like this that are raised in a perfunctory manner,

unaccompanied by some effort at developed argumentation, are deemed waived; it is not enough to mention a possible argument in the most skeletal way, leaving this Court to do considerable work. *U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990), *cert. denied*, 494 U.S. 1082 (1990). The ALJ's determination that Plaintiff did not meet the burden of proof that he satisfied an Appendix 1 listing is supported by substantial evidence, and thus this Court finds no reversible error at step three of the sequential evaluation of disability.

**B.    The ALJ Did Not Err By Failing to Give Great Weight to the FCE Completed by Ms. Bankers on December 3, 2013**

Plaintiff also argues that the ALJ should have given great weight to an FCE conducted December 3, 2013 by Ms. Bankers, a registered and licensed occupational therapist. *See* Pl. Memo at 15. The ALJ assigned little weight to the FCE and articulated various factors that guided his determination. (Tr. 24). Nevertheless, Plaintiff asks this Court to find reversible error in the ALJ's treatment of the FCE. *See* Pl. Memo. at 16–17.

This Court may not find reversible error merely because this Court would have decided the case differently. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (citing *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000)); *Loving v. Dep't of Health & Human Servs.*, 16 F.3d 967, 969 (8th Cir. 1994). This Court should "disturb the ALJ's decision only if it falls outside the available 'zone of choice.' A decision is not outside that 'zone of choice' simply because [this Court] may have reached a different conclusion had [it] been the fact finder in the

21

first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006) (citations omitted).

The ALJ considered the FCE conducted by Ms. Bankers and detailed the conclusions at length in his unfavorable decision. (Tr. 23–24). Following that discussion, the ALJ listed various reasons why he assigned little weight to the FCE:

> First, the FCE was performed to determine the claimant's ability to perform *household* tasks, rather than his ability to perform work in the competitive economy. (Tr. 24) (emphasis in original).

> Further, it is not clear whether the claimant put forth full effort in completing the testing. Overall objective findings of record by the claimant's consistent treating providers are not consistent with the level of limitation the claimant evinced during the FCE testing, and inconsistency which is not addressed in the FCE conclusions. Given these inconsistencies, greater weight is assigned the conclusions of the impartial [ME] . . . who reviewed *all* of the medical records in the file prior to the hearing. *Id.*

The ALJ may reject any opinion when it is inconsistent with the evidence in the record. *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007); *Hacker*, 459 F.3d at 937. The ALJ may discount an opinion when the limitations in the FCE stand alone and were never mentioned in treatment records or supported by any objective testing or reasoning. *Leckenby v. Astrue*, 487 F.3d 626, 632 (8th Cir. 2007).

Plaintiff outlines why the FCE conducted by Ms. Bankers—an "other source"—may be considered by the ALJ, and then details the factors to be applied to opinion evidence from "other sources." *See* Pl. Memo. at 13–15. Even

so, Plaintiff does not, and cannot, contend that the ALJ did not consider the

FCE's conclusions.  Plaintiff is correct that the FCE warranted consideration, but

does not indicate why or how the ALJ's reasoning and weighing of the FCE rises

to the level of reversible error.

The determination of residual functional capacity ("RFC") is an

administrative assessment that the ALJ determines upon consideration of all

evidence in the record.  *See* 20 C.F.R. § 404.1527(e)(2); SSR 96-5p, at *5; SSR

96-8p, 1996 WL 374184 at *2.  The ALJ bases his decision on the record as a

whole, and not any one opinion, even a treating physician's opinion.  *Cox v.*

*Astrue*, 495 F.3d 614, 619 (8th Cir. 2007); *Brown v. Barnhart*, 390 F.3d 535, 540

(8th Cir. 2004).  The ALJ found substantial evidence, considering the record as a

whole and factors detailed in 20 C.F.R. § 404.1529(c) as appropriate when

claimant's symptoms sometimes suggest a greater level of severity of impairment

than can be shown by the objective medical evidence alone.  (Tr. 19).

The decision of the ALJ to give little weight to the December 3, 2013 FCE

conducted by Ms. Bankers is supported by substantial evidence, which is

detailed at length in the ALJ's unfavorable decision and in the Factual

Background section above.  (Tr. 19–24). This Court does not find reversible error

on the issue of improper weight given to the FCE by the ALJ.

### C.    The ALJ Did Not Err in Relying on the VE's Testimony.

Plaintiff contends that the ALJ committed reversible error by relying on an

improper residual functional capacity as the basis for hypothetical questions

posed to the VE during testimony.  *See* Pl. Memo. at 15.  Further, Plaintiff argues

that this Court should reverse because the VE testified that an individual with the

limitations detailed in Ms. Bankers' FCE would not be able to work.  *See id.* at 16.

For the reasons provided in the prior section, the ALJ did not err in

assigning little weight to the FCE.  The ALJ is thus not bound by the VE's

responses to hypothetical questions that assume the FCE was entitled to

controlling weight.  *Gay v. Sullivan*, 986 F.2d 1336, 1340–41 (10th Cir. 1993).  In

deciding that jobs exist that the claimant can perform, the ALJ relied on VE's

responses to hypothetical questions that described Plaintiff's RFC.  (Tr. 25).

Reliance on such VE testimony in determination of step five of the disability

evaluation is proper.  *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006);

*Depover v. Barnhart*, 349 F.3d 563, 567 (8th Cir. 2003); *Roe v. Chater*, 92 F.3d

672, 674–75 (8th Cir. 1996); *Haynes v. Shalala*, 26 F.3d 812, 815 (8th Cir. 1994).

The VE testified that an individual with Plaintiff's RFC (Tr. 19, 64) could

alternatively perform two jobs—telephone quotation clerk or bench hand.  (Tr. 26,

65).  The VE further testified that there are approximately 4,550 combined jobs

jobs of these types in Minnesota.  *Id.*

Admittedly, the VE's response to the first hypothetical posed by the ALJ is

partially flawed in citing the incorrect job and skill level.[10]  However, the VE

correctly asserted that the telephone quotation clerk and bench hand positions

were available to the claimant.  (Tr. 64–65).  This evidence independently

---

[10] See *supra* note 7.

provided sufficient support for the ALJ to conclude that the Plaintiff has access to a significant number of jobs in the national economy. *See, e.g.*, *Young v. Apfel*, 221 F.3d 1065, 1070 (8th Cir. 2000). As a result, the ALJ's determination to grant weight to this evidence at the expense of the FCE was likely not error and represents adequate evidence for the ALJ's unfavorable decision. *See id.*

Plaintiff counters that "unless the hypothetical question comprehensively describes the limitations on claimant's ability to function, a vocational expert will be unable to accurately assess whether jobs do exist for the claimant." *Smith v. Shalala*, 31 F.3d 715, 717 (8th Cir. 1994). Plaintiff's arguments that the ALJ erred in determining RFC, as discussed in the preceding section, confirm that the hypothetical question comprehensively described the limitations on Plaintiff's ability to work. Since substantial evidence exists in the record as a whole supporting the ultimate RFC determined by the ALJ; the ALJ considered the FCE in light of the whole medical record and did not err in giving little weight to the FCE; and the ALJ did not err in relying on or weighing the accurate components of the VE's testimony, this Court finds no grounds for reversal of the unfavorable decision of the ALJ.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein,

**IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's motion for summary judgment (Doc. No. 15), be **DENIED**;

2. Defendant's motion for summary judgment (Doc. No. 17), be

   **GRANTED**; and

3. This case be **DISMISSED WITH PREJUDICE**, and judgment be

   entered accordingly.

Date:  September 14, 2015


                                   s/ *Jeffrey J. Keyes*
                                   JEFFREY J. KEYES
                                   United States Magistrate Judge



Under D. Minn. Loc. R. 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by September 29, 2015, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections. Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals. A party may respond to the objecting party's brief within fourteen days after service thereof. A judge shall make a de novo review of those portions to which objection is made. This Report and Recommendation does not constitute an order or judgment of the District Court and it is therefore not appealable to the Court of Appeals.